**SAHA THAI STEEL PIPE CO., LTD. and Thai Steel Pipe Industry Co., Ltd., Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

**Atcor, Inc., Sawhill Division of Cyclops Corp., and Wheatland Tube Corp., Intervenors.**

Court No. 86–04–00482.

United States Court of International Trade.

April 2, 1987.

Willkie Farr & Gallagher, William H. Barringer and Arthur J. Lafave, III, Washington, D.C., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, A. David Lafer, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

RESTANI, Judge:

Plaintiffs initiated this action to challenge certain aspects of the final affirmative antidumping duty determination by the Department of Commerce (Commerce) in *Certain Welded Carbon Steel Pipes and Tubes from Thailand.*[1] In their complaint plaintiffs allege, *inter alia*, that impermissible political considerations influenced Commerce's decision to calculate dumping margins based on the "best information available." *See* 19 U.S.C. § 1677e(b) (1982). Plaintiffs contend that the data they submitted to Commerce was rejected in order to artificially increase the size of dumping margins. This course of action was followed, plaintiffs argue, in order to force Thai Steel exporters to sign voluntary restraint agreements (VRA) pursuant to the President's steel import restraint and import monitoring program.[2]

In order to gather further support for these claims, plaintiffs served defendant with numerous interrogatories requesting admissions or denials that political factors improperly influenced Commerce's decision-making. Interrogatories 4–9, 34–35. Other interrogatories asked defendant to enumerate any contacts between Commerce officials and administrative or congressional figures who took an interest in the action. Interrogatories 1–3, 10–33, 36–39.

---

1. This determination is published at 51 Fed.Reg. 3389 (January 27, 1986).

2. *See* 49 Fed.Reg. 36813 (September 20, 1984) (Steel Import Relief Determination).

In response to these requests, defendant raised the following blanket objection:

Defendant objects to this discovery request upon the ground that this action is confined to a review of the record made by the administering authority and filed with the court; and that, accordingly, discovery does not lie, no order permitting discovery having been entered and no predicate for such an order having been established. See 28 U.S.C. § 2640(b); 19 U.S.C. § 1516a(b). *See also BarBea Truck Leasing Co., Inc. v. United States,* 4 CIT 159, 162 (1982); *Atlantic Sugar, Ltd. v. United States,* 85 Cust.Ct. 131, 80–16 (1980).

Plaintiffs responded to this objection by filing their Motion to Compel Discovery and for an Award of Expenses; defendant reciprocated by filing a Cross-Motion for a Protective Order.

Initially, the court must decide whether certain objections raised in defendant's motion for a protective order have been waived. Defendant's motion for a protective order argues that plaintiffs' interrogatories are inappropriate because they seek to probe the mental processes of administrative decision-makers and to have Commerce officials clarify their position beyond the statements contained in the challenged determination. Defendant's motion also alleges that plaintiffs have not made a sufficient showing of bad faith to proceed with discovery regarding improper political influence, and that plaintiffs have not shown a reasonable basis to believe that the administrative record is incomplete.

Plaintiffs argue that all of these objections have been waived because they were not included in defendant's answer to the interrogatories. The federal courts have stated that objections to interrogatories must be specific and supported by a detailed explanation of why the interrogatories are objectionable. *See, e.g., United States v. NYSCO Laboratories, Inc.,* 26 F.R.D. 159, 161 (E.D.N.Y.1960). In some cases, evasive or incomplete answers have been held to constitute the legal equivalent of an absolute failure to reply. *See Dollar v. Long Mfg., N.C., Inc.,* 561 F.2d 613, 616–17 (5th Cir.1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). Furthermore, the failure to reply in a timely manner may result in a waiver of the right to object. *Davis v. Fendler,* 650 F.2d 1154, 1160 (9th Cir.1981) (privilege against self-incrimination was waived where not timely asserted in response to interrogatories).

Although a more explicit response to plaintiffs' interrogatories would have comported better with the elusive spirit of mutual cooperation implicit in the discovery rules, the court does not find that defendant is barred from raising its objections. The strict rules advocated by plaintiff turn on two basic policy considerations: first, that vague blanket objections are improper because they force opponents to rebut all conceivable objections in their responsive motions to compel discovery; and second, that the court should not be burdened with the task of sifting through endless interrogatories in order to ascertain which ones fall within a blanket objection. *See Shenker v. Sportelli,* 83 F.R.D. 365, 366 & n. 2 (E.D.Pa.1979); *NYSCO,* 26 F.R.D. at 161. In practice, courts have not applied the waiver rules strictly where these policy concerns were not offended or other considerations intervened. For example, in *Shenker,* the court did not bar defendant's objections, but allowed the plaintiff to file a supplementary memorandum after defendant's objections had been clarified. *Shenker,* 83 F.R.D. at 367. In other cases courts have decided to consider blanket objections to interrogatories solely for reasons of "expediency." *See NYSCO,* 26 F.R.D. at 161. In this case, as in *Shenker,* the parties have been given a complete opportunity to develop their arguments.[3] Moreover, the cases cited in defendant's blanket answer refer, at least indirectly, to the objections ultimately raised in defendant's cross-mo-

---

3. Plaintiffs suffered no real hardship in preparing their motion to compel discovery. As plaintiffs themselves acknowledge, "[i]t should have been obvious to any casual reader of plaintiffs' interrogatories that objections of this type could have been made." Plaintiffs' Memorandum In Opposition To Defendant's Cross-Motion at 9.

tion.[4] Under these circumstances defendant's later objections can be viewed as merely clarifying grounds previously stated in its response to plaintiffs' interrogatories. *See Trabon Eng'g Corp. v. Eaton Mfg. Co.,* 37 F.R.D. 51, 54 (N.D. Ohio 1964) (court would consider objections filed after answer insofar as they elaborated on grounds previously advanced). The court therefore concludes that the objections presented in defendant's cross-motion were not waived.[5]

### Allegations of Impermissible Political Influence

 In actions to challenge Commerce's calculation of dumping margins, the scope of judicial review is normally confined to information contained in the administrative record. *Atlantic Sugar,* 85 Cust.Ct. at 131. Materials outside the administrative record may be discovered, however, where the party requesting discovery makes a *strong showing* of bad faith or improper behavior on the part of the officials who made the determination. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *BarBea Truck Leasing,* 4 CIT at 162. The parties agree that these cases set forth the governing legal standard on this issue, but they disagree about whether plaintiffs have made the requisite showing.

Plaintiffs contend that improper political influence can be inferred from the following facts. Commerce officials are responsible for determining dumping margins and for administering the VRA program. Dur-

ing and shortly after the investigation, Commerce officials publicly stated that the antidumping and countervailing duty laws might be used to stem the tide of imports from countries which had not signed VRA agreements with the U.S. government. *See* "TASI/AISI/WCMI Meeting Addresses Import Steel Quotas," *Port of Houston Magazine,* Apr. 5, 1985, at 11. "Steel VRA Circumvention Stirs Commerce Department," *American Metal Market,* Feb. 21, 1986, at 1, col. 2. Two weeks after the final determination contested here, the Deputy Assistant Secretary for Import Administration sent a letter to the governments of VRA countries in which he warned:

> If the [voluntary steel] arrangements' objectives are threatened, the United States Government is prepared to take administrative measures including ... [the] unfair trade laws to ensure that their objectives are met.[6]

Plaintiffs argue that these pronouncements are particularly meaningful when viewed from the standpoint of Thai steel producers. In a previous countervailing duty investigation involving Thai steel exports, Commerce found subsidies amounting to less than 2 percent *ad valorem. Certain Circular Welded Carbon Steel Pipes and Tubes from Thailand,* 50 Fed. Reg. 32,751 (August 14, 1985). Plaintiffs contend that since the subsidy margins were relatively low in that case, the only way Commerce could effectively control Thai imports would be by artificially inflating dumping margins in the instant case.[7]

---

**4.** For example, in the *Atlantic Sugar* case, the court granted defendant's motion for a protective order, stating that plaintiffs' interrogatories were "really an attempt to force the defendant to justify the administrative determination." *Atlantic Sugar,* 85 Cust.Ct. at 131. Similarly, in *BarBea Truck Leasing,* the court granted defendant's motion to delay discovery, noting that there had been "no showing of bad faith or improper behavior on the part of Customs officials...." *BarBea Truck Leasing,* 4 CIT at 162.

**5.** Although the court will consider arguments raised in defendant's cross-motion, it must deny defendant's motion for leave to file a reply to plaintiffs' opposition to defendant's motion for a protective order. Defendant has already had

sufficient opportunity to respond to the legal issues raised by plaintiffs' interrogatories. The court cannot allow the pre-trial discovery process to become needlessly protracted by endless sur-reply briefs.

**6.** The text of this letter appears in Plaintiff's Brief at Exhibit 3. Although the letter is undated and unsigned, Commerce officials have indicated that it was sent during the week of February 10, 1986. *See* "Steel VRA Circumvention Stirs Commerce Department," *supra,* at 1, col. 2.

**7.** One could speculate as easily that if Commerce were truly "out to get" Thai producers by inflating margins here, it would have artificially constructed a subsidy margin larger than 2%.

Furthermore, plaintiffs contend that Commerce has a special incentive to pursue exporters, such as plaintiffs, who import steel from VRA countries and transform it into products for exportation. This type of arrangement allows VRA signers to circumvent their agreements by exporting to countries such as Thailand. The only way for Commerce to control this activity, plaintiffs argue, is to insure that countries such as Thailand receive unfavorable results in proceedings before Commerce and the International Trade Commission.

■ The court is sensitive to the problems parties face in gathering specific proof of unlawful political suasion. Such evidence, after all, is seldom highlighted on dog-earred pages of the administrative record. Nevertheless, the court concludes that plaintiffs have not made the *strong showing* of political influence required for additional discovery rights. Courts have uniformly recognized that in all administrative action, there is a presumption of good faith on the part of the government.[8] *United States v. Roses, Inc.*, 706 F.2d 1563, 1566 (Fed.Cir.1983). In order to overcome this presumption, the party moving to compel discovery "must show specific facts to indicate that the challenged action was reached because of improper motives." *Friends of the Shawangunks, Inc. v. Watt*, 97 F.R.D. 663, 667-68 (N.D.N.Y. 1983) (defining the scope of the presumption of validity in administrative action). Another court has held that the presumption may be abandoned only in the face of "well-nigh irrefragable proof." *Kalver*

*Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301-02 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977) (rejecting allegations of bad faith against government).

Plaintiffs' proof draws its strength solely from speculation. The statements made by Commerce officials only suggest that the agency would utilize its legal remedies to counter unfair trade practices; they cannot reasonably be interpreted as a warning to exporters that Commerce would impose duties in excess of those permitted by law. The allegations made by plaintiffs could be offered in any investigation involving exporters not subject to the limits of a VRA. This is exactly the type of speculative inference that the presumption of good faith is designed to defeat.[9]

In sum, plaintiffs simply have not offered the proof necessary to justify further discovery on the issue of improper government influence.[10] Accordingly, defendant's motion for a protective order is granted with respect to Interrogatories 4-9 and 34-35, which requested admissions regarding improper political influence.

### Completeness of the Administrative Record

■ Plaintiffs may also engage in discovery outside the administrative record if they demonstrate that there is a *reasonable basis* to believe the administrative record is incomplete. *Texas Steel Co. v. Donovan*, 93 F.R.D. 619, 621 (N.D.Tex. 1982). *National Resources Defense Coun-*

---

8. In *Roses*, the Court of Appeals drew a distinction between the "presumption of good faith" and the "presumption of regularity of government action." *Roses*, 706 F.2d at 1566-67. The court noted that the latter presumption does not help to sustain an action that on its face appears irregular. In the instant case, plaintiffs' allegations primarily focus on the intent of Commerce when it calculated dumping margins. There are no allegations that the record is improper on its face, apart from plaintiffs' contention that it should have contained evidence of political influence. Under these circumstances, both presumptions properly apply to the agency action here at issue.

9. *See supra*, note 7.

10. Plaintiffs also argue that their interrogatories are appropriate under *Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). In *Accardi*, a deportable alien alleged that the denial of his application for suspension of deportation was prejudged by the Attorney General, who had issued a list of "unsavory characters" deserving deportation. Unlike plaintiffs' allegations in the instant case, the allegations in *Accardi* were supported by specific proof. An affidavit submitted by the government's counsel admitted that Accardi "was on the Attorney General's proscribed list of alien deportees." Without comparable evidence the court is unable to allow discovery aimed at establishing that Commerce's discretion was removed by administration officials in a similar manner.

*cil, Inc. v. Train,* 519 F.2d 287, 291–92 (D.C.Cir.1975). Plaintiffs contend that the administrative record is incomplete because it contains no reference to (1) the President's Steel Program; (2) the relationship between the President's Steel Program and unfair trade cases involving steel imports from countries that have not signed VRAs; (3) the dual roles of the Deputy Assistant Secretary of Commerce for Import Administration, who is responsible for achieving the goals of the President's Steel Program and conducting the antidumping duty investigation; and (4) communications between Commerce Department officials and USTR officials, Members of Congress or their staffs, or representatives of the petitioning domestic industry, with respect to the restriction or inhibition of steel imports from non-VRA countries or otherwise concerning the conduct of the Thai pipe and tube antidumping duty investigation. Plaintiffs' Memorandum in Opposition to Defendant's Cross-Motion at 14–15. Plaintiffs argue that it is highly unusual for such information to be missing from the record, since "the political sensitivity of these issues reached its height during the period in which the antidumping investigation was being conducted." Plaintiffs' Memorandum in Opposition to Defendant's Cross-Motion at 21.

Plaintiffs' argument depends upon the same facts presented in their previous allegations of improper political influence. Plaintiffs would not expect to find *ex parte* communications in the record unless they believed that some attempt to influence Commerce had been made. In effect, plaintiffs have transformed their "political influence" argument into an "incomplete record" argument in order to take advantage of a lower standard of proof.

Even under this lower standard of proof plaintiffs' motion must fail. Plaintiffs' charges of *ex parte* communications remain purely speculative. No facts have been presented to show that such communications were made, or that actions on behalf of the President's steel program influenced the documentation submitted to the court by Commerce. In cases where dis-

covery has been allowed to supplement the record, courts have recognized that the "reasonable basis" test requires more than mere speculation. *See, e.g., Natural Resources Defense Council,* 519 F.2d at 291 (movant specifically identified an issue briefing book that was left out of the record); *Exxon Corp. v. Department of Energy,* 91 F.R.D. 26, 34–35 (N.D.Tex.1981) (movant demonstrated that record submitted by agency did not include materials required by internal agency memorandum); *Tenneco Oil Co. v. Department of Energy,* 475 F.Supp. 299, 317 (D.Del.1979) (incompleteness was evident from the content of the record itself). For these reasons defendant's motion for a protective order is also granted with respect to interrogatories 1–3, 10–33, and 36–39.

Because plaintiffs' motion to compel discovery has been denied, their motion for an award of expenses is also denied. U.S.C. I.T. Rule 37(a)(3).